IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Board of Trustees of the Toledo
Area Sheet Metal Workers Pension Plan,

          Plaintiff,

v.

Karpathia Funding Group, Inc., *et al.*,

          Defendants.

Case No. 3:22-cv-00264

**ORDER**

This is a suit for collection on an assessment of withdrawal liability under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1381 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").

Plaintiff, the Board of Trustees of the Toledo Area Sheet Metal Workers Pension Plan ("Plaintiff") seeks to collect withdrawal liability from Defendants Aerodynamics Inspecting Company, Inc. ("Aerodynamics"), Laszlo Lukacs ("Lukacs"), and several other corporate entities (collectively, "Defendants").

On October 25, 2023, I granted default judgment against all corporate Defendants including Aerodynamics. Defendant Lukacs is the only Defendant whom I have not entered a judgment. *See Bd. of Trustees of Toledo Area Sheet Metal Workers Pension Plan v. Karpathia Funding Grp., Inc.*, 704 F. Supp. 3d 799 (N.D. Ohio 2023) (Carr, J) ("*Lukacs I*").

Before me is Plaintiff's motion for summary judgment against Lukacs. (Doc. 42). Lukacs, *pro se*, filed an opposition (Doc. 44), Plaintiff filed a reply (Doc. 45) and, without first seeking leave to do so, Lukacs filed a sur-reply (Doc. 47).

On November 11, 2024, Plaintiff filed a notice of supplemental authority, informing me of the Sixth Circuit's recent decision in *Local No. 499, Board of Trustees of Shopmen's Pension Plan v. Art Iron, Inc.*, 117 F.4th 923 (2024). (Doc. 48). On November 19, 2024, Lukacs filed a response to Defendant's sur-reply. (Doc. 49).

For the reasons I discuss below, I grant Plaintiff's motion for summary judgment against Lukacs.

## Background

### 1. Procedural Background

Plaintiff contends that Defendants: (1) failed to fulfill their obligation to contribute[1] to a multiemployer pension plan;[2] and (2) that Lukacs is jointly and severally liable for Defendant Aerodynamics' unpaid obligations to the Plan.

Earlier in the case, Plaintiff asked me to grant it a judgment on the pleadings against Lukacs on this theory. (*See* Doc. 32). In my Order denying Plaintiff's motion, I observed that it was Plaintiff's burden to link sufficiently Lukacs to Aerodynamics under a legal theory such as piercing the corporate veil or alter ego. *Lukacs I*, *supra*, 704 F. Supp. 3d at 802. I noted that, in general, courts do not adjudicate piercing the veil or alter ego until the summary judgment phase of the case. *Id*.

---

[1] The statute, 29 U.S.C. § 1392(a) defines the "obligation to contribute" as "an obligation to contribute arising—(1) under one or more collective bargaining (or related agreements)[…] but does not include an obligation to pay withdrawal liability under this section or pay delinquent contributions[.]"

[2] The statute, 29 U.S.C. § 1301, defines a "multiemployer plan" as:
>  a plan—(A) to which more than one employer is required to contribute,
>  (B) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and
>  (C) which satisfies such other requirements as the Secretary of Labor may prescribe by regulation, except that, in applying this paragraph—
>  (i) a plan shall be considered a multiemployer plan on and after its termination date if the plan was a multiemployer plan under this paragraph for the plan year preceding such termination, and
>  (ii) for any plan year which began before September 26, 1980, the term "multiemployer plan" means a plan described in section 414(f) of Title 26 as in effect immediately before such date[.]

In its summary judgment motion, Plaintiff provides adequate evidence of the connection between Lukacs personally and Aerodynamics, which I discuss further below. (Doc. 42, PgID. 599).

**2. Statutory Background**

In *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, the Sixth Circuit explained: "Congress enacted [ERISA], to ensure that 'if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.'" 726 F.3d 738, 740 (6th Cir. 2013) (quoting *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 375 (1980)).

Later, Congress realized that "ERISA failed to address the adverse consequences that occurred when an employer withdrew from a multiemployer pension plan[.]" *Id*. at 741. Congress enacted the MPPAA to address this concern. *See id*.

Several key principles to the MPAA are relevant here.

"The first principle is that an employer withdrawing from a fund must make withdrawal liability payments." *Id*. The *Findlay Truck* Court explained:

> Any employer withdrawing from a multiemployer plan must make a payment of "withdrawal liability," which is calculated as the employer's proportionate share of the plan's unfunded, unvested benefits. 29 U.S.C. § 1381(a). The MPPAA provides that once a fund determines that an employer has withdrawn from its plan, it must notify the employer of the amount of the liability, prepare a schedule for liability payments, and demand payment in accordance with the schedule. 29 U.S.C. §§ 1382, 1399(b)(1).

*Id*.

Another key principle is that "even if an employer disputes the withdrawal liability payments, the employer must make payments to the fund no later than 60 days after the fund demands such payments, and must continue to make them until the dispute has been resolved." *Id*. at 741–42

3

(citing 29 U.S.C. § 1399(c)(2) and 29 U.S.C. § 1401(d)). This is known as the "pay now, dispute later" process. *Id*. at 742 (citation omitted).

The *Findlay Truck* Court explained: "The congressional intent behind 'pay now, dispute later' is to alleviate the risk that during the course of arbitration, an employer will become insolvent, and the fund will not be able to collect in the event of a favorable award." *Id.* (citation omitted).

The last relevant principle "is that disputes over withdrawal liability between an employer and a fund must be arbitrated." *Id*. The statute states: "Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1).

*Findlay Truck* explained: "Congress intended the arbitration provision to promote "'judicial economy and judicial restraint.'" *Id*. (citation omitted).

Along with these principles, Congress recognized the need to prevent employers from dodging their withdrawal liability obligations through the operation of separate entities. 29 U.S.C. § 1301(b)(1) states:

> For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

The Sixth Circuit recognizes this language to impose joint and several withdrawal liability on an employer under a common control group for withdrawal from multiemployer plans. *See Central States Se. and Sw. Areas Pension Fund v. Chatham Properties*, 929 F.2d 260, 263 (6th Cir. 1991).

### 3. Factual Background

Plaintiff contends that Aerodynamics was an employer obligated to contribute to the Plan under a collective bargaining agreement. (Doc. 142 PgID. 600). On May 1, 2016, Aerodynamics'

4

obligation to contribute to the Plan ended. (*Id*.). Aerodynamics, Plaintiff alleges, continued performing work in the Plan's jurisdiction.

This continued work in the same trade or business triggered Aerodynamics' obligation to pay withdrawal liability. (*Id*. at PgID. 599). This is clear from the statute, 29 U.S.C. § 1381, which states: when "an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."

In accordance with the procedures in 29 U.S.C. § 1399(b), on September 9, 2019, the Plan sent a demand letter to Aerodynamics and its control group members, including Lukacs. (*See* Sept. 9, 2019 Letter, Doc. 1-3, PgID. 111–15). The letter explained that recipients were liable for withdrawal liability in the amount of $217,143.00. (*Id*. at PgID. 111). It stated: "You may prepay any or all monthly payments without penalty. A failure to make any monthly payment when due will result in the Trustees declaring the entire unpaid withdrawal liability to be due and owing, together with interest thereon until paid in full." (*Id*. at PgID. 111).

In his February 22, 2024, deposition Lukacs acknowledged receiving the letter sometime in September 2019. (Doc. 41-1 PgID. 491–92 (Lukacs Dep. Trans. 23:24–24:11)).

Plaintiff contends that, "Aerodynamics, Lukacs, and the other defendants failed to make the initial payment on November 1, 2019. None of the Defendants requested a review of the withdrawal liability assessment and, more importantly, none of the Defendants initiated arbitration to contest the demand, as statutorily required." (Doc. 42, PgID. 600–01).

Lukacs confirmed this in his deposition. He testified that neither he, nor any of the other Defendants, arbitrated after receiving the September 9, 2019 demand letter. (*See* Doc. 41-1, PgID. 492 (Lukacs Dep. Trans. 24:6–24:18)).

5

### 4. Lukacs and Aerodynamics Background

Plaintiff submits the facts below in support of Lukacs' link to Aerodynamics to support its argument that I should hold Lukacs liable for Aerodynamics' withdrawal liability.

Lukacs testified that he owned 100% of Aerodynamics beginning when he purchased it in about 1968. (Doc. 42, PgID. 602 (citing Lukacs Dep. Trans. Doc. 41-1, PgID. 552–53).

Aerodynamics' 2015 tax return confirms that Lukacs owned 100% of the company's stock.[3] (*See* Doc. 43-20, PgID. 918). Further, Lukacs' personal tax returns confirm his purchase of the company as well as his sale or disposal of all shares of the company on December 31, 2020. (*See* Doc. 43-23, PgID. 1063).

Lukacs testified that he and his wife owned real property located at 6325 Chase Road in Dearborn, Michigan ("Chase Road Property"). (*See* Doc. 41-1, PgID. 500). His personal tax returns show that he and his wife claimed all rents and expenses associated with the Chase Road Property for several years. (*See, e.g.*, Doc. 32-19, PgID. 832).

Aerodynamics paid Lukacs for rental of the Chase Road Property from 2015 to 2017. (*See e.g.*, Doc. 43-19, PgID. 856). Lukacs claimed a sale of the Chase Road Property on January 1, 2018. (Doc. 43-21, PgID. 948).

Lukacs' briefs are, to put it generously, difficult to decipher. He repeats several arguments that he made in earlier filings such as that he is Laszlo A. Lukacs, not Laszlo R. Lukacs, and that the tax returns indicating Laszlo A. Lukacs owned Aerodynamics are "a mistake." (Doc. 44, PgID. 1337). He does not provide documentary evidence to support a tax mistake.

---

[3] "Tax returns… are sworn statements." *Art Iron, supra*, 117 F.4th at 932.

**Legal Standard**

Established law provides that summary judgment is appropriate where the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If satisfied, then the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). I draw all justifiable inferences from the evidence presented in the record in the light most favorable to the non-moving party. *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245 (6th Cir. 1997).

**Discussion**

Lukacs operated a trade or business under the common control of Aerodynamics. I therefore treat him as part of the employer, who incurs joint and several liability under ERISA. See 29 U.S.C. §§ 1362(a), 1301(a)(14)(B), 1301(b)(1).

1. **Waiver**

The MPPAA states that, where an employer fails to demand an arbitration, it waives its right to dispute the assessment. *See* 29 U.S.C. § 1401(b)(1).

Plaintiff has met its burden to show that the Plan complied with its determination, calculation, and notice obligations. It has also met its burden to show that Lukacs (and Aerodynamics) failed to challenge the Plan's determinations under the statute. Lukacs (and Aerodynamics) also failed to arbitrate. Any argument Lukacs could have made to dispute his obligation is waived.

That said, because (1) Plaintiff has satisfied its burden of showing the Lukacs engaged in trade or business under common control of Aerodynamics; (2) Lukacs is *pro se* and I construe his filings

liberally under *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); and (3) I draw all inferences in favor of the non-movant (Lukacs), I will briefly discuss this issue.

### 2. Trade or Business

Lukacs is in a "trade or business" that subjects him to joint and several liability under the MPPAA. In reaching this decision, I am bound by two Sixth Circuit cases discussing the meaning of "trade or business" *Pension Benefit Guar. Corp. v. Findlay Indus.*, 902 F.3d 597 (6th Cir. 2018) and *Art Iron, supra*, 117 F.4th 923.

In *Findlay Industries*, Findlay, a company that produced auto parts, went out of business in 2009. *Id*. at 601. Its unpaid pension obligation to the Pension Benefit Guaranty Corp (PBGC) totaled over $30 million. PBGC looked to trades or businesses under Findlay's common control to satisfy Findlay's liability. *Id*. at 600–01. PBGC looked to hold Findlay's founder's trust (the "Trust") among others, liable for Findlay's debt. *Id*.

The Trust was under the control of the founder's two sons, who also controlled Findlay itself before Findlay closed. The Trust owned the land on which Findlay was located and leased it to Findlay. *Id*. at 600. For the majority of the time the Trust existed, it was leasing back to Findlay the very land that the founder originally placed in the trust. *Id*. at 602.

The Trust argued that it should not be liable for Findlay's debts because it was not a "trade or business" under ERISA. *Id*. at 605. The Sixth Circuit disagreed.

The Court explained "ERISA does not define 'trades or businesses,' and neither the Supreme Court nor this court have defined the phrase in the context of ERISA." *Id*. at 605. The Court stated, "What is important is determining whether those assets were effectively Findlay's and thus should be used to help pay what Findlay promised its employees." *Id*. at 606.

The Court held:

8

> In light of the purpose and the structure of the ERISA provisions at issue, we hold that the categorical test applies. That test concludes simply that any entity that leases property to a commonly controlled company is categorically a trade or business for ERISA purposes. *Cent. States Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 882 (7th Cir. 2013). In doing so, the categorical test stops leases between commonly controlled entities as a way of offering those entities protection from ERISA liability at very little risk. The facts here highlight how. By giving the land to a commonly controlled entity, Findlay guaranteed that it still had the benefit of use (and likely control) of the land, just the same as if it had never given the land away at all. But now, the land did not technically belong to Findlay, so it did not count among Findlay's assets. Thus, Findlay had all of the meaningful benefit of the land, but none of the risk or responsibility that came with outright ownership. And the [] Trust did not have to put in any of the effort or face any of the risk of an arms-length leasing arrangement with a lessee that was not under common control. This situation is precisely the type that the common-control rules exist to prevent.

*Id*. at 607.

The facts before me are nearly congruent. Lukacs owned the Chase Road Property, which he leased to Aerodynamics during the relevant time period. He owned both the property and the company leasing it. Similar to the Trust in *Findlay Industries*, Lukacs had the benefit of owning the land Aerodynamics operated on, but none of the risk or responsibility to Aerodynamics that would have come with outright ownership.

I therefore apply the *Findlay Industries* categorical test. This is consistent with ERISA's principle of enforcing an employer's promise by extending liability for those promises to commonly controlled entities. Lukacs, by leasing land to his own business, engaged in a "trade or business" for ERISA purposes. Not only did Lukcas fail to cite a single case "in which leasing between commonly controlled entities did not result in an entity being a trade or business for ERISA purposes," I have found none. *Id*. at 607.

The second controlling Sixth Circuit case is *Art Iron*, *supra*, 117 F.4th 923. There, Art Iron owed the pension plan for over $1 million in withdrawal liability. *Id*. at 926. The pension plan board sought to hold Robert Schlatter, Art Iron's sole shareholder and director at the time it

9

withdrew from the plan, liable for Art Iron's obligation. *Id*. at 927. Schlatter also operated a consulting business as its sole proprietor. *Id*. at 926.

Schlatter did not challenge that his operation of a consulting business qualified as an enterprise under "common control" as Art Iron. *Id*. at 928. Rather, he argued that he was not in the "trade or business" under the MPPAA. *Id*.

The Sixth Circuit confirmed that when that entity leases property to a company under common control, the *Findlay Industries* "categorical test" applies. *Id*. at 930–31. In *Art Iron*, Schlatter was not leasing a company under common control; rather, he ran a consulting business. The Court thus applied a different test, known as the *Groetzinger* test,[4] for defining trade or businesses outside of a lease situation.[5] *Id*. at 931.

As I have detailed, the circumstances here involve a lease situation. Thus, the *Findlay Industries* categorical test applies. Lukacs' ownership and lease of the Chase Road Property to Aerodynamics is, under this test, the same "trade or business" as Aerodynamics.

3. **Common Control**

In the background section, I cited record evidence that, at the relevant time, Lukacs owned 100% of Aerodynamics. Lukacs and his wife owned the Chase Road Property, which they rented to Aerodynamics (and other companies). Lukacs claimed that income and rental property expenses on his personal tax returns.

As Plaintiff aptly explains in its motion, the Internal Revenue Code recognizes three types of "common control": (1) parent-subsidiary; (2) brother-sister; and (3) combined groups. (Doc. 42, PgID. 608 (citing 26 U.S.C. § 1563(a); 26 C.F.R. § 414(c))).

---

[4] *Commissioner v. Groetzinger*, 480 U.S. 23 (1987).
[5] Even applying the *Groetzinger* test, the Court found that Schlatter was liable for Art Iron's withdrawal liability because his consulting work qualified as the same "trade or business" as Art Iron. *Id*. at 931–32. The *Groetzinger* test, however, does not apply here.

10

Plaintiff persuasively asserts that Lukacs and Aerodynamics satisfy the "brother-sister" categorization:

> The term "brother-sister group of trades or businesses under common control" means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of § 1.414(c)–4) a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization. The five or fewer persons whose ownership is considered for purposes of the controlling interest requirement for each organization must be the same persons whose ownership is considered for purposes of the effective control requirement.

26 C.F.R. § 414(c)(1).

Plaintiff explains that Lukacs, who was the sole proprietor of Aerodynamics at the time of its withdrawal, was in "effective control" over it. *See* 26 C.F.R. § 1.414(c)(2)(iv) (defining a person in "effective control" of an organization if the person "owns such sole proprietorship."). Lukacs' deposition testimony, personal tax returns, and tax returns for Aerodynamics confirm this.

In sum, I agree with Plaintiff that Lukacs is liable for Aerodynamics' withdrawal obligations under the control group liability theory.

I reject Lukacs' arguments against liability, such as that he shares a name with his son and that he made a mistake on this tax returns. Lukacs provides no evidence of these "mistakes."[6] He merely states his arguments in his briefs. I further reject any other arguments Lukacs may have made that I have not addressed.

The Sixth Circuit has observed that "'a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement' that contradicts his or her litigating position without first explaining the contradiction or attempting to

---

[6] Such as, for example, his filing of amended tax returns.

11

resolve the discrepancy." *Art Iron*, *supra*, 114 F.4th at 932 (citing *Cleveland v. Pol'y Mgmt. Sys. Corp.,* 526 U.S. 795, 806-07 (1999)).

Lukacs' arguments are "blatantly contradicted by the record" and I reject them. (*Id*. (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### 4. Liquidated Damages, Interest, Attorney Fees, and Costs of Enforcement

Plaintiff argues that I should find Lukacs liable for liquidated damages, interest, attorney fees, and costs. The MPAA specifically authorizes the exact relief Plaintiff seeks here. *See* 29 U.S.C. § 1132(g)(2).

Additionally, the bargaining agreement that Lukacs signed also provides for, additionally, reasonable attorney fees and costs, liquidated damages, and interest. (*See* Doc. 1-2, PgID. 88).

Plaintiff alleges that the agreement provides for a 20% liquidated damages award (*see* Doc. 42, PgID. 611), however, my review of the agreement indicates that the parties agreed to a 10% liquidated damages amount. (*See* Doc. 1-2, PgID. 88).

Plaintiff requested leave to supplement the record with the amount if interest, attorney fees, and costs owed. I grant leave. I also order Plaintiff to explain its liquidated damages calculation with citations to the record.

Plaintiff shall, within ten (10) days of entry of this Order, so supplement the record. Defendant shall file any opposition on or before January 10, 2025. However, Defendant is cautioned that the scope of his opposition shall be limited to arithmetic-based arguments. This is not an opportunity to re-litigate any issues that I have decided in this or a prior opinion in this case. His doing so may result in an imposition of sanctions for improperly attempting further to prolong this litigation. Plaintiff may file a reply, if necessary, on or before January 25, 2025.

**Conclusion**

It is, therefore, ORDERED THAT:

1. Plaintiff's motion for summary judgment against Lukacs (Doc. 42) be, and the same hereby is, granted; and

2. On or before ten days after entry of this Order, Plaintiff shall submit, as described above, its supplemental statement.

SO ORDERED.

Date: 12/5/2024 　　　　　　　　　　　　　　　　　　　 /s/ *James G. Carr*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Sr. U.S. District Judge